UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMELLA BURT, et al., | Case No. 73-cv-00906-JCS |
| Plaintiffs, | |
| v. | **ORDER GRANTING MOTION TO VACATE CONSENT DECREE** |
| COUNTY OF CONTRA COSTA, et al., | **Dkt. No. 212** |
| Defendants. | |

## I.      INTRODUCTION

Before the Court is a Motion to Vacate Consent Decree (hereafter, "Motion") filed by the County of Contra Costa, (hereafter, "County") and the Contra Costa County Fire Protection District ("Fire District") (collectively, "Defendants"). In 1975, the Consent Decree was entered to remedy an alleged pattern of employment discrimination against women and racial and ethnic minorities in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2 *et seq.* Defendants now ask the Court to vacate the Consent Decree under Rule 60(b)(5) of the Federal Rules of Civil Procedure on grounds that they have satisfied its terms and that prospective enforcement would be inequitable. Plaintiffs contend that the Consent Decree has not been satisfied and should still be enforced. The Court held a hearing on the Motion on December 20, 2013, at 9:30 a.m.

This Motion presents the difficult question of whether, after 38 years, a court order designed to promote equal opportunity in County employment should be vacated, even though the County has not met precisely the numerical tests included in the decree. As explained below, those numerical tools measure the percentage of racial and ethnic minorities and women in each job classification, and set a goal that those percentages reach at least 80% of the percentages of

qualified members of those groups in the County employment pool.  While the correct method of calculating the County's progress in this regard is not clear from the Decree, by the Court's calculation, the County is approximately 70% of the way toward the rough numerical representation envisioned by the decree: 70% of the time, the County employs women, racial and ethnic minorities in percentages equal to or greater than 80% of their representation in the County labor pool.

These numbers indicate that the County's performance has not been perfect, and that there is more work to be done.  In the past 38 years, however, the County has taken substantial steps to comply with the decree, and has made enormous progress.  After 38 years, there has been no showing of any substantial ongoing violation of law.  Continued court supervision of the County's hiring, promotion, discipline and termination of its employees is no longer necessary.  Therefore, the Motion to Vacate Consent Decree is GRANTED.[1]

## II.     BACKGROUND

### A.     The Complaint

In 1973, three women filed a class action complaint against the County under Title VII of the Civil Rights Act of 1964, which prohibits "discriminat[ion] against any individual … because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Plaintiffs alleged "a long and persistent pattern of discrimination against females and persons of racial and ethnic minorities in employment by the County of Contra Costa[.]"  Declaration of Pamela Y. Price in Opposition to Defendant Contra Costa County's Motion to Vacate Consent Decree, Ex. B (First Amended Complaint) ("FAC") at 1.  One of the plaintiffs, Linda Croskey, a Caucasian female, alleged that she was fired for excessive absences when there were forty-one other employees with more absences over the same period.  FAC at 4-5.  The two other plaintiffs, Mary Gonzales (a Hispanic female) and Samella Burt (an African American female), alleged that they were denied promotions from a training program because of their race and gender.  FAC at 4.

The First Amended Complaint alleged that "[f]emales and person of racial and ethnic

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

minorities are concentrated in low paying dead end jobs from which there are few if any opportunities for advancement." *Id*. at 2. Plaintiffs believed that the "systematic denial to females and persons of racial and ethnic minorities of equal employment opportunity in County employment is due directly and proximately to the Defendants' use of unlawful, discriminatory, and non-ability related hiring and promotion practices." *Id*. Such practices were alleged to have included "[p]assing over fully qualified female and minority job applicants and employees in favor of less qualified male White applicants and employees in making hiring and promotion selections," "[e]stablishing and maintaining arbitrary and unreasonable requirements for employment which do not measure job performance capability but do disqualify large numbers of females and persons of racial and ethnic minorities," "[u]sing tests, written and non written, which have not been professionally validated as job related and which have the effect of excluding females and persons of racial and ethnic minorities, especially concentrating on subjective oral exams in higher profession positions," "[p]lacing females and persons of racial and ethnic minorities in positions in which they are deprived of opportunity for promotion and advancement," as well as "[f]ailing and refusing to promote females and persons of racial and ethnic minorities to supervisory and managerial positions on the same basis as White male employees who have been promoted, and further failing to recruit and hire females and members of racial and ethnic minorities for supervisory and managerial positions." *Id*. at 3.

**B.      The Consent Decree**

In 1975, the parties stipulated to the entry of the Consent Decree. *See* Declaration of Jane B. Moore in Opposition to Defendant Contra Costa County's Motion to Vacate Consent Decree, Ex. A ("Consent Decree") at 1. United States District Judge Stanley A. Weigel entered the decree on October 14, 1975. *Id*. at 14. In Article I of the Consent Decree, the County's Fire Protection Districts were granted leave to intervene as defendants and became subject to the requirements of the Decree.[2] *Id*. at 2 (Art. I).

---

[2] Defendants explain that while there were initially several fire protection districts in Contra Costa County, today there is currently only one Contra Costa County Fire Protection District that is subject to the requirements of the Consent Decree.

United States District Court
Northern District of California

The Consent Decree states that Plaintiffs brought the action "to remedy an alleged pattern and practice of employment discrimination against females and persons of racial and ethnic minority status," and establishes the case as a class action "on behalf of a class comprised of plaintiffs and all other persons denied employment or advancement by defendants or who have been harassed in their employment by defendants because of their sex or racial or ethnic minority status." *Id*. at 1; *see also id*. at 13 (Art. V).  The Decree was entered "without any finding or adjudication on the merits of the case and without constituting any admission by the defendants of discrimination." *Id*. at 1.  Article IX provides that "[a]fter five years from the entry of this Consent Decree either party by noticed motion may apply to the Court for an order vacating said decree and dismissing these actions on the ground that further supervision by the Court is not necessary." *Id*. at 14.

The Consent Decree imposes many obligations upon Defendants.  To facilitate the implementation of the Decree, the County was required to appoint "an Affirmative Action Officer with the same authority as a Civil Service Department division chief, whose duties will include working with plaintiffs' representative in carrying out the County's Affirmative Action Program." *Id*. at 9 (Art. II, § F-1).  The Consent Decree also granted the Civil Service Commission authority "to receive [and determine] complaints from persons claiming employment discrimination on account of their sex or minority status," as well as resolve disputes arising from the Decree. *Id*. at 14 (Art. VIII).

The Article II establishes the "plan for equal opportunity in Contra Costa County," referred to in the Consent Decree as the "Affirmative Action Program." *Id*. (Art. II).  Section A-1 of Article II states that "[i]t is the goal of the parties that the percentage of minorities and females employed in each job classification and each department in each county employment reflect the supply of qualified members of minority groups and females in the work force in Contra Costa County." *Id*. (Art. II, § A-1).  As discussed further below, the parties dispute the proper interpretation and import of this goal.

The Consent Decree outlines certain determinations that the County must make to attain this goal.  First, the County must determine whether there is an "imbalance in the number of

qualified females or minorities employed … as to any specific job classification." *Id*. (Art. II, § A-4(a)).  There is an "imbalance in the number of females or minorities employed … only when such number is less than 80% of the number of representative of the percentage available in the work force of Contra Costa County for a given job classification." *Id*. at 3 (Art. II, § A-5(b)).

To determine whether an imbalance exists, the County must compare the percentages of minorities and females employed by the County to the percentages of qualified minorities and females in the workforce in the County.  The Consent Decree provides that these latter figures "shall be determined from the most recent available State of California Employment Development Department Affirmative Action Data." *Id*. at 3 (Art. II, § A-5(a)).  It further provides that "[i]f such data does not provide information adequate to make a clear determination as to the work force composition for a given job classification, the parties shall rely upon other information which shall be given weight in accordance with the objectivity, experience, and expertise supporting it." *Id*.

If an imbalance is found to exist, the County then must determine "[t]he number of females and minorities which should be included in county employment to correct any such imbalance…." *Id*. at 2 (Art. II, § A-4(b)).  This number "shall be not less than 100% of that number reflecting employment equal to the percentage of qualified females or minorities in the work force in Contra Costa County for the classification." *Id*. at 3 (Art. II, § A-5(c)).  The County must establish "[t]imetables setting interim and final target dates by which specific progress towards correcting such imbalances should be attained." *Id*. at 2 (Art. II, § A-4(c)).  The Consent Decree provides that "[t]imetables for progress shall be based upon the yearly number of vacancies occurring within the job classification, through employee turnover and the creation or elimination of new positions." *Id*. at 3 (Art. II, § A-4(d)).

There are also limitations to the goal of correcting imbalances in job classifications.  Section A-2 states that "[a]ction to attain the goal of the parties will be carried out within the context of the merit system." *Id*. (Art. II, § A-2).  Thus, Defendants are not required to make hiring decisions solely based on race and/or gender.  In addition, Article III provides that "[n]othing in this Consent Decree shall require or be construed to require defendants to hire,

discharge, promote or demote any employee, to hire or maintain more employees than are needed to perform the work available, to create any job classification, or to continue in effect any work or job classification now being performed or in existence." *Id.* at 13 (Art. III).  Accordingly, Defendants are also not required to correct an imbalance by creating or maintaining unnecessary positions in County employment.

Rather, an imbalance should be corrected through certain changes to the County's hiring, recruitment and separation practices.  For instance, if an imbalance exists, then Plaintiffs may request review of the minimum qualifications of that particular job classification, which triggers the County's duty to "reevaluate" the qualifications "with a view to isolating and eliminating probable factors which disproportionately reject females and minorities without being job related." *Id.* at 5 (Art. II, § B-2).  The Consent Decree provides that "[r]equirements such as experience in unskilled positions and education in nonprofessional or nonmanagerial positions will be subject to special study." *Id.*  Defendants are "responsible for showing [that] minimum qualifications are reasonably related to job performance." *Id.*

If Plaintiffs request a minimum qualifications review with respect to a job classification where an imbalance exists, then "examinations" for such job classifications are also subject to scrutiny.  The County must "give plaintiffs notice of the breakdowns as to the sex and minority status of those persons taking and those persons passing such examinations, including the ranking of those passing, without indicating names." *Id.* at 6 (Art. II, § C-3).  The Consent Decree provides that a "[t]esting imbalance shall be deemed to exist in an examination if the passing rate of the number of qualified females or minorities who participate in the examination is less than 80% of the passing rate of the remaining participants." *Id.* (Art. II, § C-4).

The Consent Decree also requires the Affirmative Action Officer to "make serious efforts to insure that women and minorities do apply for County employment." *Id.* at 7 (Art. II, § D-1). Defendants must "reach minorities and women and attract them to apply for county employment" by "[p]ubliciz[ing] the Affirmative Action Program regularly through appropriate channels which may include newspapers, and, on a public service basis, radio and television," "[w]ork[ing] closely with minority and women's groups and minority and women's training programs in recruiting

minorities and women to apply for jobs," "[s]chedul[ing] examinations for entry level classifications with a large number of positions in East County (Pittsburg) and West County (Richmond) as well as Central County (Martinez)," and "[m]ak[ing] a special effort to recruit welfare recipients to county employment." *Id.* (Art. II, § D-2).

With respect to persons separated from County employment, the Consent Decree requires Defendants to provide them "with a written form indicating that they may appeal within two weeks to the Affirmative Action Officer and the Civil Service Commission … if they believe the separation was motivated by discrimination based on sex or minority status." *Id.* at 9 (Art. II, § E-1). The complaint is investigated initially by the Affirmative Action Officer. If this initial investigation is not to the satisfaction of the employee, the matter is referred to the Civil Service Commission which must "render a written decision as to whether the separation was motivated by discrimination based on sex or minority status[.]" *Id.* (Art. II, § E-2). The Consent Decree does not prevent an employee from filing a discrimination complaint in state or federal court. *Id.* (Art. II, § E-3).

The Consent Decree also requires Defendants to provide certain information to Plaintiffs, and envisions a collaborative process between the parties to achieve the goals of the Consent Decree. For instance, Section A-3 states that "[d]efendants will supply plaintiffs with a numerical and percentage breakdown for each minority and for females employed in each job classification and each department in county employment, as reflected by data available to the defendants." *Id.* at 2 (Art. II, § A-3). Defendants must also provide Plaintiffs (1) the timetables and goals on an annual basis (§ A-6), (2) persons separated from County employment at six month intervals (§ A-7), and (3) information concerning new or additional project employment programs and/or employee training programs administered by the County every six months (§ D-7).

Moreover, if an imbalance exists, Plaintiffs may request review, with respect to that particular job classification, of (1) the determinations of an imbalance, goals, and timetables (§ A-11), (2) the minimum qualifications (§ B-1), and (3) the examinations (§ C-2). In all matters, the parties are required to attempt to reach an agreement. If no agreement is reached, the matter is to be referred to the County's Civil Service Commission. *See id.* at 5 (§ A-11); at 6 (§ B-3); at 7 (§

United States District Court
Northern District of California

C-7).  Plaintiffs also have the right to appeal any decision of the Civil Service Commission to arbitration.  *Id*.  The Civil Service Commission is to make a decision within one month of all matters except a separations review.  *Id*. at 10 (Art. II, § F-3(d)).

### C.    Defendants' Motion to Vacate the Consent Decree

On July 12, 2013, just short of 38 years from the date in which the Consent Decree was entered, Defendants filed a Motion to Vacate the Consent Decree.  *See* Dkt. No. 212 (Motion to Vacate Consent Decree) ("Motion").  Defendants filed the Motion under Rule 60(b)(5) of the Federal Rules of Civil Procedure, which provides, in relevant part, that a "court may relieve a party or its legal representative from a final judgment order" if "the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." Fed.R.Civ.P. 60(b).  Defendants contend the Consent Decree should be vacated on two alternative grounds.  First, Defendants contend that the purpose of the Consent Decree has been fulfilled, which deems the Consent Decree "satisfied." Second, Defendants contend the Consent Decree should be vacated because its prospective application is no longer equitable.

####           1.    *Satisfaction of the Decree*

Defendants argue that the purpose of the Consent Decree−to establish a plan for equal employment opportunity in Contra Costa County−has been satisfied.  Defendants state that the objective of the Consent Decree, articulated in Section A-1, is that "the percentage of minorities and females employed in each job classification and each department in county employment reflect the supply of qualified members of minority groups and females in the work force in Contra Costa County."  Motion at 3 (quoting Consent Decree at 2 (Art. II, § A-1)).  Defendants assert that the success of the plan to provide equal employment opportunities is reflected by work force of the County and Fire District, which is substantially more diverse today than it was in 1975.

United States District Court
Northern District of California

United States District Court
Northern District of California

1     Defendants submitted charts comparing the percentage of women and minorities employed

2 by the County and the Fire District in 1975 to those employed in 2012.[3]  *See* Declaration of

3 Antoine Wilson ("Wilson Decl."), Exs. C & G; *see also* Motion, Exs. A & D (same).  In 1975, the

4 County workforce was comprised of 57% women and 14% minorities, and the fire districts were

5 comprised of 3% women and 3.4% minorities.  *Id.*  By 2012, the percentage of women employed

6 by the County increased from 57% to 66%, and the percentage of women employed by the Fire

7 District increased from 3% to 15%.[4]  *See id.*  The percentages of minorities employed by the

8 County increased from 14% to 51%, and the percentage of minorities employed by the Fire

9 District increased from 3.4% to 28%.  *Id.*  For both the County and the Fire District, there was an

10 increase in the percentage of each minority group evaluated by the charts: African Americans,

11 Hispanics and Asians.[5]  *Id.*

12     Defendants also submit a chart showing that, with the exception of the Hispanic

13 community, the percentages of females and minorities in the County workforce are equal to or

14 greater than the percentages of females and minorities in the County labor force.  *See* Wilson

15 Decl., Ex. D; *see also* Motion, Ex. B (same).  The chart states that the 2010 U.S. Census Bureau

16 data shows that the labor force in Contra Costa County is comprised of 47% women, 51%

17 Caucasians, 9% African-Americans, 22% Hispanics and 16% Asians.  The chart compares these

18 figures to the County's workforce in 2012, which is comprised of 66% women, 49% Caucasians,

19 17% African-Americans, 17% Hispanics and 17% Asians.  *Id.*

---

[3] The County states that the County workforce data is based upon self-reporting from County employees.  Wilson Decl. ¶ 3. The data is compiled through the County's software database called PeopleSoft.  *Id.* ¶ 4.

[4] In the Motion, the County incorrectly writes that "[i]n 2012, twelve percent more women were employed in the Fire District than were employed in the Fire District in 1975."  Motion at 8. It is clear from the chart, however, that the County intended to write that the number of women employed by the Fire District increased by twelve percentage *points* between 1975 and 2012, an increase from 3% to 15%.  *See* Wilson Decl., Ex. G.

[5] The County explains that the following ethnicities are have been grouped into the "Asian" category for comparison purposes: Asian, Native Hawaiian/Pacific Islander, and American Indian/Alaskan Native.  Wilson Decl. ¶ 3.

United States District Court
Northern District of California

Defendants also submit an exhibit entitled "Occupational Category Data," which contains eight charts reflecting the following eight occupational categories: (1) Officials/Administrators; (2) Professionals; (3) Technicians; (4) Protective Service Workers (Sworn); (5) Protective Service Workers (Non-Sworn); (6) Administrative Support; (7) Skilled Craft Worker; and (8) Service Maintenance.  *See* Wilson Decl. ¶ 10 and Ex. E; *see also* Motion, Ex. C (same).  Each occupational category encompasses several job classifications.  For example, the occupational category of "Professionals" includes employees in the following job categories: "Physicians, Attorneys, Librarians, Registered Nurses, Accountants, Management Analysts, and Psychologists."  Wilson Decl. ¶ 10.

The Occupational Category Data compares the percentages of women and minorities employed by the County in various occupational categories to the percentages of women and minorities who, according to Census data from 2010, live in Contra Costa County and are employed in these occupational categories.  The chart below shows the "Officials/Administrators" occupational category and exemplifies the structure of all eight occupational category charts:

| Officials/Administrators | 1975 County Workforce Data | 2012 County Workforce Data | 2010 Countywide Labor Force (Census Data) |
|---|---|---|---|
| Males | 85% | 38% | 58% |
| Females | 15% | 62% | 42% |
| Caucasians | 92% | 61% | 66% |
| African-Americans | 2% | 13% | 7% |
| Hispanics | 2% | 11% | 10% |
| Asians | 4% | 14% | 15% |

Wilson Decl., Ex. E.  The County used similar comparisons of the percentages of women and minorities employed across occupational categories in their 2008 Affirmative Action Report.  *See* Declaration of Emma Kuevor in Support of Motion to Vacate ("Kuevor Decl."), Ex. A.

Defendants further contend that women and minorities are not only employed in low level jobs with few opportunities for advancement, but rather are employed in all occupational

10

1  categories.  They note that three of the five members of the Board of Supervisors are female, and

2  another member is an African American male.

3          Defendants also argue that they have substantially complied with the Consent Decree by

4  developing a comprehensive system of policies and practices to provide equal employment

5  opportunities to women and minorities.  As required by the Consent Decree, the County appointed

6  an Affirmative Action Officer, which the County now refers to as the "Affirmative Action/Equal

7  Employment Opportunity Officer."  Between December 22, 1975 and March 31, 2011, the

8  position was held by Emma Kuevor.  Kuevor Decl. ¶ 1.  Ms. Kuevor was responsible for (1)

9  developing, implementing, coordinating and evaluating the County's Affirmative Action Program,

10  (2) implementing the requirements of the Consent Decree, (3) investigating and mediating

11  complaints of discrimination, (4) establishing and implementing County procedures for processing

12  discrimination complaints, and (5) drafting the Affirmative Action and Equal Employment

13  Opportunity reports.  Kuevor Decl. ¶ 2.  Antoine Wilson has been employed in the position since

14  September 10, 2012, and has substantially the same responsibilities.  Wilson Decl. ¶¶ 1-2.

15          Moreover, in 1980, voters in Contra Costa County approved the Merit System Ordinance,

16  which established the County's Merit Board to replace the Civil Service Commission discussed in

17  the Consent Decree.  As required by the Consent Decree, the Merit Board is vested with the

18  authority to monitor the County's personnel management system and decide discrimination

19  complaints.  *See* RJN, Ex. H at 2 (§ 33.3-5).  Section 33-3.703 of the Merit System Ordinance

20  specifically prohibits discrimination in employment on account "political or religious or labor

21  organization opinions or affiliations, or his race, color, national origin, sex, age, or handicap."  *Id.*

22  (§ 33-3.703).

23          In addition, the County has issued Personnel Management Regulations which have the

24  force of law in Contra Costa County.  *See* RJN, Ex. H at 4 (§ 33-3.1303).  Part 14 of the Personnel

25  Management Regulations expands the prohibition on discrimination to "sexual orientation or other

26  unlawful discrimination."  RJN, Ex. D (PMR 1401).  The regulations further provide for

27  investigation of complaints of discrimination by the County's Affirmative Action/Equal

28

United States District Court
Northern District of California

1   Opportunity Officer, and give the Merit Board jurisdiction to decide such complaints.  *Id.* (PMRs

2   1402-03).

3        Defendants further contend that they have developed a comprehensive system to recruit

4   women and minorities.  The County's Assistant Human Resources Director, Deborah Preston,

5   states that the County's Human Resources Department uses the data reflecting imbalances in

6   certain jobs to establish an outreach plan for recruitment of County positions.  Declaration of

7   Deborah Preston in Support of Motion to Vacate ("Preston Decl.") ¶ 3.  Preston writes in her

8   declaration:

9        When HR conducts a recruitment, HR sends the job announcement
         to 500 community based organizations, agencies and other
10       specialized employers that associate with specific communities.  If
         there is an imbalance in the job classification, HR will conduct a
11       targeted outreach for the category in which there is an imbalance.
         For example, if HR is administering a recruitment for a
12       classification that is imbalanced as to Asian-Americans, HR will
         send out a targeted recruitment to those organizations, agencies and
13       employers in the Asian-American community.

14   Preston Dec. ¶ 7.

15       Finally, Defendants claim they have developed systems to maintain its plan for equal

16   employment opportunities even after the Consent Decree is vacated.  On May 7, 2013, when the

17   Board of Supervisors passed a resolution to move to vacate the Consent Decree, the Board also

18   established a Hiring Outreach Oversight Committee, which is composed of two Board members

19   who must review the statistical data of minorities and females in the County's workforce and

20   make recommendations for target outreach and recruitment.  RJN, Ex. F.  Moreover, Preston, the

21   County's Assistant Human Resources Director, writes that the review of minimum qualifications

22   for a certain job classifications "is an industry wide best practice and is critical to the County's

23   recruitment process," and states that "HR consultants perform this review regardless of

24   [Plaintiffs'] requests and make changes to the minimum qualifications when and as needed."  *Id.*

25   Preston Decl. ¶ 4.

26             2.    *Inequitable Prospective Application*

27       Defendants contend the Consent Decree should be vacated for the additional reason that

28   "applying it prospectively is no longer equitable."  Fed.R.Civ.P. 60(b)(5).  Defendants state that,

United States District Court
Northern District of California

United States District Court
Northern District of California

1   in deciding this issue, courts consider the whether ongoing enforcement is supported by ongoing

2   violation of federal law, and whether changed political, social or legal conditions render the

3   Consent Decree unnecessary.  Defendants argue that the fact the Consent Decree could not be

4   vacated for the first five years is indicative of an expectation that it would take five years to be

5   certain that the procedures outlined in the Decree would be implemented.

6       Defendants note that since the Consent Decree was entered, new laws have been enacted to

7   protect individuals from unlawful discrimination and to encourage equal employment

8   opportunities.  Such laws include the Americans with Disabilities Act of 1990 (42 U.S.C. §§

9   12101 *et seq.*), the California Fair Employment and Housing Act (Cal. Gov't Code §§ 12940 *et*

10  *seq.*) and the Civil Rights Act of 1991 (42 U.S.C. §§ 1981 *et seq.*).  The County compares the

11  collective breadth of these laws, which protect various groups such as persons with disabilities, to

12  the limited scope of the Consent Decree, which only protects women and racial and ethnic

13  minorities.

14      Defendants further argue that because the objective of the Consent Decree has been

15  fulfilled, responsibility to ensure a diverse workforce must be returned to local officials because

16  the continued enforcement of the Consent Decree undermines the authority and responsibility of

17  the County.  The Assistant Director of Human Resources states that since she started working for

18  the County in 2010, Plaintiffs' counsel has "not provided any evidence that any of the County's

19  minimum job qualifications revealed gender or race bias."  Preston Decl. ¶ 6.   In the last five

20  years, Plaintiffs' counsel has not appealed the County's employment standards, practices or

21  policies with the County's Merit Board, and has not requested arbitration pursuant to the Consent

22  Decree or filed a motion to enforce the decree.  Declaration of Jachyn Davis in Support of Motion

23  to Vacate ("Davis Decl.") ¶ 6.

24      Defendants also contend that the Consent Decree is an unnecessary burden on limited

25  public resources.  The County states that compliance with the Consent Decree requires a

26  substantial amount of staff time.  Preston Decl. ¶ 8.  The Consent Decree also requires the County

27  to pay Plaintiffs' counsel at Price & Associates a significant amount in attorneys' fees.  The 2013

28  billing rate is $530 per hour for Pamela Price and $490 per hour for Price's associates.  Davis

1    Decl. ¶ 3.  Between September 12, 2001 and March 16, 2013, the County paid Price & Associates

2    $644,653.02.  Declaration of Linda Bruno in Support of Motion to Vacate ¶ 4.

3        **D.      The Opposition**

4        Plaintiffs oppose the County's Motion to Vacate the Consent Decree.  *See* Dkt. No. 227

5    (Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant Contra Costa

6    County's Motion to Vacate Consent Decree) ("Opp.").  Plaintiffs contend that the County has not

7    met its burden of showing that the Consent Decree's requirements have been satisfied, or that

8    prospective application of the Consent Decree would be inequitable.

9        1.      *Satisfaction of the Decree*

10       Plaintiffs contend that the Consent Decree is "deemed satisfied" if the goal set forth in

11   Section A-1 is attained such that "the percentage of females and minorities employed in each job

12   classification and each department is equal to or greater than the percentage of qualified females

13   and minorities in the workforce[.]"  Opp. at 6:10-12.  Plaintiffs argue that this goal has not been

14   attained, as Plaintiffs' monitoring has "revealed disproportionate impacts on women and

15   minorities in Defendant County's hiring and recruitment process[.]"  *Id.* at 3.

16       Plaintiffs state that the County's 2012 Timetables and Goals reveals imbalances in the

17   percentages of women and minorities employed in approximately 282 of the 328 job

18   classifications, which translates to a 86% imbalance in the number of females and/or minorities

19   employed in the County's job classifications.  Opp. at 3-4.  At the beginning of the 2012

20   Timetables and Goals, there is an index that lists 328 job classifications.  *See* Dkt. No. 229

21   (Declaration of Pamela J. Owens) ("Owens Decl."), Dkt. No. 229-1 (Ex. A: 2012 Timetables and

22   Goals).  For each job classification, the index indicates whether there is an imbalance in that job

23   classification with respect to females and/or a particular minority group.  *See id.*  For example, the

24   first four rows of the index appear as follows:

25

26

| No. | Job Classification | Imbalance |
|---|---|---|
| 1 | Agricultural Biologist I | Female and Asian |
| 2 | Agricultural Biologist II | Female and Asian |
| 3 | Assessor's Clerical Staff Manager | Hispanic/Latino, Native Hawaiian/Pacific Islander, and |

| | | American Indian/Alaskan Native |
|---|---|---|
| **4** | Cardiology Technician I | Hispanic/Latino, Native Hawaiian/Pacific Islander, and American Indian/Alaskan Native |

*See id.* at 1. For 46 of the 328 job classifications, the index states there is "No Imbalance." *Id.* at 1-10. Conversely, there is at least one imbalance with respect to women and/or a particular minority group in 282 out of the 328 job classifications. To calculate the 86% statistic, Plaintiffs divided 282 by 328. *See id.*; *see also* Owens Decl. ¶ 10. Thus, while not explicit in their brief, Plaintiffs' statement that 86% of the job classifications are not in balance means that there is an imbalance with respect to either females or at least one minority group for 282 out of the 328 job classifications. *See* Dkt. No. 229-1 at 1-10.

Plaintiffs argue that the County failed to use the proper method of determining whether it has achieved the goal set forth in Section A-1, which requires the percentages of women and minorities employed by the County to reflect the percentages of qualified women and minorities from Contra Costa County. Consent Decree at 2 (Art. II, § A-1). Plaintiffs state that instead of comparing the percentages of women and minorities employed in each job classification, as required by section A, the County only compared data across broad occupational categories.

As a result of this use of overbroad data, Plaintiffs argue that the County's method of comparing the percentages of women and minorities in occupational categories fails to consider whether women and minorities are concentrated in the low paying job classifications with fewer opportunities for advancement. For example, there are three job classifications for accountants at varying pay levels: Accountant I, II and III. The 2012 Timetables and Goals reflect an imbalance only in the higher Accountant II and III positions, but not in the Accountant I position. *See* Dkt. No. 229-1 at 7, 9. The County's comparisons across broad occupational categories do not reflect this discrepancy.

Plaintiffs contend that the County has failed to comply several provisions of the Consent Decree, and in particular, sections A-3, A-4, A-5, A-6, A-7, A-8, B-1, B-2, B-3, DC-2, C-3, D-1, D-2, D-7 and F-2. Many of these provisions impose similar obligations on the County. First,

United States District Court
Northern District of California

1    Plaintiffs contend that the County failed to provide Plaintiffs, on a yearly basis, with a numerical

2    and percentage breakdown of the number of females and minorities in each job classification and

3    in each department.  Plaintiffs cite section A-5, which states that "[t]imetables shall include *yearly*

4    interim goals," and section A-6, which states that "[s]pecific goals and timetables that have been

5    determined shall be subject to review an reconsideration upon the written request of either party

6    … at *yearly* intervals[.]"  Consent Decree at 3 (Art. II, §§ A-5, A-6) (emphasis added).  Plaintiffs

7    argue that despite their appeals, the County failed to timely provide the 2011 and 2012 Workforce

8    Surveys, thereby forcing Plaintiffs to use outdated Timetables and Goals.  Owens Decl. ¶ 4.

9    Plaintiffs also accuse the County of acting in bad faith for failing to provide Plaintiffs with the

10   2012 Workforce Survey after filing the instant Motion, in light of the fact the County had this data

11   since January 28, 2013.  *See* Wilson Decl., Ex. B (showing a January 28, 2013 run date for the

12   2012 Workforce Survey).

13         Plaintiffs contend the County failed to provide Plaintiffs with timely information regarding

14   the County's "separations," as well as information regarding new project and training programs,

15   every six months as required by sections A-7 and D-7 of the Consent Decree, respectively.

16   Plaintiffs explain that the last "separations" report provided by the County was from December 31,

17   2010.  Owens Decl. ¶ 8.  Plaintiffs also state that instead of providing information on the new

18   project and training programs every six months, the County only provided this information to

19   Plaintiffs upon request.  *Id*. ¶ 19.  Plaintiffs further contend that the County consistently failed to

20   provide them with ranking information, despite their repeated requests.

21         Plaintiffs argue that the County failed to respond timely to several of Plaintiffs' requests

22   for minimum qualifications review for job classifications in violation of § B-3.  Section B-3

23   provides that "if agreement is not reached within *one month* after a review of a given minimum

24   qualifications has been requested, the matter shall be referred to the Civil Service Commission for

25   hearing and decision."  *Id*.  Consent Decree at 6 (Art. II, § B-3) (emphasis added).  Plaintiffs

26   contend that the County has delayed its responses to Plaintiffs' requests for minimum

27   qualifications review by as much as 8 months in 2010, 3 months in 2011, 4 months in 2012, and 5

28   months in 2013.  *See* Owens Decl. ¶¶ 14-17 and Exs. G, H & I.  Plaintiffs state that when the

United States District Court
Northern District of California

16

1    County did respond, it simply provided the minimum qualifications and said they were

2    "appropriate" without providing any analysis.  *See id.*

3           Plaintiffs argue that the County failed to comply with its recruitment obligations under

4    sections D-1 and D-2, which require the County to "make serious efforts to insure that women and

5    minorities do apply for County employment."  Consent Decree at 7 (Art. II, § D-1).  Plaintiffs also

6    contend that the County's Hiring Outreach Oversight Committee is not qualified to monitor the

7    County's recruitment and hiring practices.  Plaintiffs provide no direct evidence in support of

8    these contentions.  Plaintiffs merely cite the 86% imbalance rate in job classifications, as well as

9    the County's comparisons across broad occupational categories.

10          Plaintiffs also note that in June of 2013, the County made possession of an Associate of

11   Arts Degree a minimum qualification for the position of Human Resources Technician.  *See*

12   Owens Decl. ¶ 12 and Ex. E.  Pursuant to the Consent Decree, because the position of Human

13   Resources Technician is not a managerial position, the requirement of any education is deemed

14   suspect.  *See* Consent Decree at 5 (Art. II, § B-2).  Plaintiffs provide no evidence that, while

15   subject to scrutiny, this requirement either engenders racial, ethnic or gender imbalances, or

16   otherwise discriminates.

17                    2.    *Equitable Prospective Application*

18          Plaintiffs also argue that prospective application of the Consent Decree is equitable, as

19   there are current and ongoing violations of Title VII, and because the County has failed to show a

20   significant change in factual conditions or the law or that continued enforcement of the Consent

21   Decree is detrimental to the public interest.  Plaintiffs cite the 86% imbalance rate in the County's

22   job classifications as support for their contention that there are ongoing violations of Title VII.

23   Plaintiffs note the County's practice of requiring Associate's and Bachelor's degrees for non-

24   managerial positions.  Plaintiffs also argue that the disparity between women employed in low

25   paying jobs compared to high paying jobs is illustrated by the employee composition in the Fire

26   Prevention Department.  Opp. at 17.[6]

27   _____

28          [6]  Plaintiffs cite the 2005 Workforce Survey, but the Court cannot find the 2005 Workforce
     Survey in the record.  Plaintiffs cite Exhibits P and Q to the Owens Declaration, but neither

United States District Court
Northern District of California

1    Plaintiffs also contend that prospective enforcement of the Consent Decree is not

2    detrimental to the public interest, as the costs of monitoring ($30,00 to $50,000 per year) presents

3    no significant financial strain on the County's budget.  Plaintiffs cite the Recommended Budget

4    for 2013-14, which shows that there is improvement in the County's overall financial status.  *See*

5    RJN, Ex. G ("After several years of significant challenge we are starting to see improvement in

6    our financial status.").

7    **III.    DISCUSSION**

8        "Consent decrees have elements of both contracts and judicial decrees."  *Frew ex rel. Frew*

9    *v. Hawkins*, 540 U.S 431, 437 (2004).  A consent decree "embodies an agreement of the parties"

10   and is also "an agreement that the parties desire and expect will be reflected in, and be enforceable

11   as, a judicial decree that is subject to the rules generally applicable to other judgments and

12   decrees."  *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 378 (1992).

13       Under Rule 60(b)(5) of the Federal Rules of Civil Procedure, a consent decree may be

14   vacated or modified if it has "been satisfied, released, or discharged; it is based on an earlier

15   judgment that has been reversed or vacated; or applying it prospectively is no longer equitable[.]"

16   Fed.R.Civ.P. 60(b)(5).  The Supreme Court has written that "[u]se of the disjunctive 'or' makes it

17   clear that each of the provision's three grounds for relief is independently sufficient and therefore

18   that relief may be warranted even if petitioners have not 'satisfied' the original order."  *Horne v.*

19   *Flores*, 557 U.S. 433, 454 (2009).

20       The County seeks to vacate the Consent Decree under the first and third prongs of Rule

21   60(b)(5) on grounds that the Decree has been satisfied and that its prospective application is

22   inequitable.  The County bears the burden under either prong.  *Rufo*, 502 U.S. at 383; *Horne*, 557

23   U.S. at 447.

24   //

25

26   _____

27   Exhibit was provided to the court with chambers' copies, and only Exhibit P is posted on the
     Electronic Court Filing system.  *See* Dkt. No. 229-42.  Exhibit P appears to only contain minutes

28   for the Hiring Outreach Oversight Committee, and contains no information relevant to the
     employee composition of the Fire Prevention Department or the 2005 Workforce Survey.

United States District Court
Northern District of California

1

### A.      Satisfaction of the Decree – Substantial Compliance

#### 1.      Legal Standard

To determine whether the County has "satisfied" the Consent Decree, the relevant standard is whether the County "substantially complied" with the requirements of the Consent Decree.  *Jeff D. v. Otter*, 643 F.3d 278, 283-84 (9th Cir. 2011) (quoting *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 236 (1975)) ("Because consent decrees have 'many of the attributes of ordinary contracts [and] ... should be construed basically as contracts,' … the doctrine of substantial compliance, or substantial performance, may be employed.").  While substantial compliance "is not susceptible of mathematically precise definition," the standard implies "something less than a strict and literal compliance with the contract provisions but fundamentally it means that the deviation is unintentional and so minor or trivial as to not substantially to defeat the object which the parties intend to accomplish."  *Otter*, 643 F.3d at 284 (quotations omitted).  Thus, the County has the burden to establish that it "substantially complied with the requirements of the Consent Decree, and that any deviation from literal compliance did not defeat the essential purposes of the decrees."  *Id.*

In *Jeff v. Otter*, the Ninth Circuit reversed the district court's decision vacating a consent decree, in part because the district court only considered whether there was compliance with specific "action items" in the consent decree "and said noting of the overall objectives of the decree."  *Otter*, 643 F.3d at 288.  The court wrote:

> The status of compliance in light of the governing standards require overall attention to whether the larger purposes of the decrees have been served.  Indeed, this requirement is inherent in the very nature of "substantial compliance."  "[T]he touchstone of the substantial compliance inquiry is whether Defendants frustrated the purpose of the consent decree—i.e., its essential requirements."

*Otter*, 643 F.3d at 288 (quoting *Joseph A. v. New Mexico Dep't of Human Servs.*, 69 F.3d 1081, 1086 (10th Cir. 1995)).  Thus, this Court's inquiry is not limited to the specific requirements of the Consent Decree, but also the greater objectives of the consent decree.  "Explicit consideration of the goals of the decrees …, and whether those goals have been adequately served, must be part of the determination to vacate the consent decrees."  *Otter*, 643 F.3d at 289.

United States District Court
Northern District of California

Moreover, in this case, there is a particular provision of the Consent Decree, separate from the terms that order the County to undertake certain actions, which bears on the "substantial compliance" inquiry.  The Consent Decree provides that any party may seek to vacate the decree, after just five years, on the ground that "further supervision by the Court is not necessary."  Consent Decree at 14 (Art. IX).  This standard counsels a more flexible approach in determining whether to continue the enforcement of the decree.  First, under the decree, the standard for vacating the decree changes after five years: before the end of five years, the decree itself would not permit a motion to vacate the decree as unnecessary.  Second, by leaving it to the Court to determine whether continued enforcement is "necessary," the Decree vests the Court with broader discretion than the traditional "substantial compliance" test under Rule 60(b)(5).

2.      **Whether the County has Substantially Complied with the Consent Decree**

The main dispute in this case centers on Defendants' compliance with specific provisions of the Consent Decree designed to facilitate the creation of a more diverse County workforce.  In particular, the parties dispute whether Defendants satisfied section A-1, which articulates the following goal:

> It is the goal of the parties that the percentage of minorities and females employed in each job classification and each department in county employment *reflect* the supply of qualified members of minority groups and females in the work force in Contra Costa County.

Consent Decree at 2 (Art. II, § A-1) (emphasis added).  Plaintiffs contend that the Consent Decree is "deemed satisfied" when "the percentage of females and minorities employed in each job classification and each department is equal to or greater than the percentage of qualified females and minorities in the workforce…."  Opp. at 6:10-13.  Defendants argue that literal attainment of this goal is impossible with respect to all job classifications, and further contend that increased diversity in County employment demonstrates that this goal has been adequately served.

There is no provision in the Consent Decree which requires Defendants to literally attain the goal of a numerical balance in all job classifications.  Section A-1 does not require, by its terms, that each and every job classification be in balance for each and every minority group and

for gender.  Rather, section A-1 sets the laudable goal that job classifications "*reflect* the supply of qualified members of minority groups and females in the work force in Contra Costa County." Consent Decree at 2 (Art. II, § A-1) (emphasis added).  This indicates that it is *not* a requirement of the Consent Decree that all job classifications be "in balance"−i.e. that the representation of women and minorities in all job classifications be at least 80% of their percentages in the labor pool.  Rather, the 80% "balance" measurement is a tool for achieving a County workforce that "reflects" the available qualified population.

This interpretation of section A-1 is consistent with Title VII, which "is express in disclaiming any interpretation of its requirements as calling for outright racial balancing."  *Ricci v. DeStefano*, 557 U.S. 557, 582 (2009) (citing 42 U.S.C. § 2000e-2(j)).  Defendants may have agreed, by stipulating to the Consent Decree, to undertake more than Title VII requires. Nevertheless, Title VII still prohibits Defendants from, *inter alia*, discriminating against any employee on the basis of race or gender.  In particular, Title VII prohibits Defendants from taking an adverse action based on race or gender unless there is "strong-basis-in-evidence" to show that without such action, Defendants would be liable under a disparate impact theory for a facially neutral policy.  *Ricci*, 557 U.S. at 583.

Moreover, for several job classifications, attainment of an exact numerical (80%) balance for all races and for women is only possible if another provision of the Consent Decree is to be disregarded.  Article III states that the Consent Decree should not be construed to require Defendants to create or maintain any unnecessary positions in order to correct an imbalance. Consent Decree at 13 (Art. III).  Nevertheless, if Defendants had to employ, for women and each minority group, and for each job category, a percentage equal to 80% of qualified women and minorities in the County labor force, the County would be compelled to create more positions. For instance, the job classification of "Assessor's Clerical Staff Manager" has only one position, and that position is filled by an African American woman.  Dkt. No. 229-1 at 3.  Imbalances still exist, however, with respect to the following minority groups as to that job classification: Hispanic/Latino, Asian, Native Hawaiian/Pacific Islander, and American Indian/Alaskan Native. *See id.*  If section A-1 required Defendants to correct all of these imbalances, Defendants would

21

United States District Court
Northern District of California

1   have to create more positions and fill them with individuals of these races.  In this case, it would

2   be impossible to attain the goal of section A-1 without disregarding Article III.

3        Accordingly, the Court does not find literal attainment of the 80% numerical balance in all

4   job classifications to be essential to the purpose of the Consent Decree.  *Otter*, 643 F.3d at 284.

5   That is not to say, however, that section A does not impose any obligations upon Defendants.

6   Rather, there is a reason the Consent Decree specifically requires the County to compare the

7   percentages of women and minorities employed in "each job classification" to qualified women

8   and minorities in the County.  This language was used for a particular purpose─it is a tool to

9   accomplish the more general goal that the number of women and minorities employed in all jobs,

10  at all levels of employment, reflect the available labor pool.

11       Therefore, the first inquiry is whether the progress made by the County with respect to the

12  goal of a workforce that reflects the County-wide workforce renders the Decree unnecessary.

13  "Reflect" is not a mathematical concept.  There are no useful cases defining, even for the

14  traditional substantial compliance test, what percentage of the required tasks or goals must be

15  achieved to justify dissolution of the Decree.  As set forth in the following paragraphs, the Court

16  concludes that Plaintiffs have not provided any useful statistics on the question of whether the

17  County workforce now reflects the available qualified minorities and women in the County-wide

18  workforce.  However, the Court is persuaded that court supervision is no longer necessary by (1)

19  its own numerical analysis of diversity reflected in the evidence before the Court, (2) the diversity

20  statistics presented by the County, (3) the absence of any showing that the County has violated the

21  substantive anti-discrimination provisions of the Decree in the last five years, (4) the mechanisms

22  put in place by the County to prevent discrimination and promote diversity, and (5) the expansion

23  of remedies available under Title VII which provide greater deterrence against intentional

24  discrimination.

25       Plaintiffs argue that there is an 86% imbalance in females and/or minorities employed in

26  various job classifications.  This statistic, however, does not accurately reflect whether Defendants

27  complied with the Consent Decree.  Plaintiffs' 86% imbalance rate was derived by counting 282

28  out of 328 job classifications in the 2012 Timetables and Goals where there is *at least one*

*imbalance* with respect to either females or a particular minority group. *See* Owens Decl. ¶ 10, Ex. A. For example, the job classification of "EHS Program Integrity Assistant" has three positions that are filled by three women. *See* Owens Decl., Ex. A at 39. One woman is African American, one woman is Hispanic/Latino, and one woman appears to be Caucasian. *See id.* There is an imbalance as to Asians, but no imbalance as to females, African Americans and Hispanic/Latino. Because there is an imbalance as to Asians, Plaintiffs count the *entire* job classification as imbalanced.

Plaintiffs' method overstates the imbalance rate by ignoring, within each job category, minority groups whose numbers are in balance, if there are *any* minority groups whose representation in the job is not in balance. If an imbalance rate is to be calculated with the data in the 2012 Timetables and Goals, then that imbalance rate must, at the very least, take into account whether, for each job classification, there is an imbalance in each of the six status categories: females, African American, Hispanic/Latino, Asian, Native Hawaiian/Pacific Islander, American Indian/Alaskan Native. Properly applied to the 328 job classifications, the imbalance rate equals 31%.[7] In other words, 69% percent of the time, the County employs women and racial minorities in percentages equal to or greater than 80% of their representation in the County's labor pool.

Even the Court's statistic, however, understates the progress that the County has made to achieve the goal of section A-1 of the Consent Decree. The Court's methodology, like Plaintiffs', counts imbalances in certain status categories even when there are fewer positions in the job classification than there are status categories. For instance, the job classification of "Assessor's Clerical Staff Manager" has only one position, and that position is filled by an African American woman. *See* Dkt. No. 229-1 at 14. Pursuant to Article II of the Consent Decree, the County is not required to create any more positions in this job classification. Nevertheless, the Court's statistical

---

[7] Using the data from the index in the 2012 Timetables and Goals, the Court reaches this number by dividing the total number of imbalances (605) by the total number of *possible* imbalances (1968). The total number of imbalances is determined by counting the imbalances that exist in each status category for each job classification. The total number of possible imbalances is calculated by multiplying the number of status categories (6) by the number of job classifications (328).

United States District Court
Northern District of California

1    method still counts four imbalances with respect to the Hispanic/Latino, Asian, Native

2    Hawaiian/Pacific Islander and American Indian/Alaskan Native categories.

3           The Court's conclusion is buttressed by the statistics prepared by the County.  Of course,

4    these statistics are not as granular as the Consent Decree requires−they gloss over important

5    distinctions between job classifications.  Nonetheless, they show progress in promoting diversity.

6    Defendants submit charts which show that, on a general level, there is greater diversity in the

7    County and Fire District workforce today than there was in 1975.  For instance, Defendants

8    submitted two charts showing that employees in the County and Fire District are more diverse

9    today than they were in 1975.  *See* Wilson Decl. Exs. C & G.  Another chart shows that, with the

10   exception of the Hispanic community, the percentages of women and certain minority groups in

11   the County's workforce are equal to or greater than the percentages of women and those minority

12   groups in the County's labor force.  *See id*., Ex. D.  For the broad group of jobs described as

13   Officers/Administrators, the County workforce in general employs minorities and females at rates

14   approximately equal to or greater than their representation in the County wide workforce for

15   African Americans, Hispanics, Asians and females.  *See* Wilson Decl. Ex. E.  These numbers

16   reflect a great change from the situation in 1975.[8]  *Id*.

17          There are several more reasons why continued supervision of the County's hiring and

18   promotion practices is unnecessary.  While Plaintiffs complain about the County's failure to

19   provide them with complete information, and about the County's failure to provide them with

20   some information at all, there is no evidence that Plaintiffs employed the remedial provisions of

21   the Decree to correct any County conduct in violation of the Decree.  The Consent Decree

22   explicitly refers Plaintiffs to the Merit Board for disagreements that arise with respect to

23   imbalances, goals and timetables (§ A-11), minimum qualifications (§ B-3), examinations (§ C-7),

24   _____

25          [8] Nevertheless, these charts do not show what kinds of jobs are held by the women and
     minorities employed today.  They do not show whether women and minorities are concentrated in
26   the highest or lowest job classifications, or whether they receive the most or the least amount of
     pay.  As Plaintiffs note, the occupational categories are too broad.  Each occupational category
27   encompasses any number of jobs.  "Professionals," for example, includes attorneys, librarians,
     teachers, and several more.  Section A, however, specifically requires the County to determine
28   imbalances with respect to job classifications.

United States District Court
Northern District of California

and separations (§ E-2).  Despite these provisions, Plaintiffs present no evidence that, in any recent time period, they ever sought to enforce the Consent Decree by appealing to the Merit Board.  To the contrary, the County provided evidence that, in the last five years, Plaintiffs have not appealed the County's standards, practices or policies to the Merit Board, or otherwise sought to enforce the Decree.  *See* Davis Decl. ¶ 6.

This absence of complaint is not surprising.  The County, which had little if any meaningful anti-discrimination and affirmative action framework in 1975, has developed and implemented a series of policies and laws aimed at promoting diversity and preventing discrimination.  It is worth noting that these policies and laws have addressed a broader range of discrimination, and encouraged a broader range of diversity, than that encompassed by the Consent Decree.  The Consent Decree addresses discrimination in County employment against "racial and ethnic minorities" and women.  Consent Decree at 1.  On the other hand, the County's current Affirmative Action Plan, Employment Discrimination Procedures, Personnel Management Regulations, and Merit System Ordinance apply to discrimination on the basis of age, disability, medical condition, religion, political views, affiliation with a labor organization, marital status and sexual preference (in addition to discrimination against women and racial and ethnic minorities).  *See generally* RJN, Ex. B, C, D, F & H.

In June of 1980−five years after the Consent Decree was entered−County voters passed the Merit System Ordinance.  RJN, Ex. H.  That ordinance broadly prohibits discrimination in County employment.  It established the jurisdiction of the Merit Board to hear and determine discrimination complaints, and to hear "appeals from actions of dismissal, suspension, or reduction in rank or compensation."  *Id*. at § 33-3.909.  The County supplemented the ordinance with the Personnel Management Regulations and, in 1993, the Employment Discrimination Complaint Procedure.  RJN, Exs. D and B.  The Personnel Management Regulations affirmed the jurisdiction of the Merit Board, and the jurisdiction of the Director of Human Resources−with appeals to the Affirmative Action Officer−of complaints regarding selection procedures, including examinations.  RJN, Ex. D at §§ 210-11).  The Personnel Management Regulations also establish

procedures for examination, selection, promotion, separation and appeals.  *Id.* at §§ 501 *et seq.*, 1001 *et seq.*

Similarly, the Employment Discrimination Complaint Procedure applies to all complaints of discrimination in the County, RJN Ex. B at Art. III, and supplements the Personnel Management Regulations.  *Id.* at Art. III.  The procedures require each department to designate a person to receive and investigate complaints.  *Id.* at Art. IV.A.1.  They also allow for two levels of appeal−to the Affirmative Action Officer, and to the Merit Board.  *Id.* at Art. VI.A.2 and VI.A.3.

Since 1975, the County has also employed an Affirmative Action Officer, and later developed its Affirmative Action Plan.  *See generally*, RJN, Exs. E and F.  The County created the Advisory Council in Equal Employment Opportunity in 1991 to advise regarding the implementation of the County Affirmative Action Plan.  RJN, Ex. E.  The Board of Supervisors also directed each department to develop a plan to implement the Affirmative Action Plan.  *Id.*  As a result, each department has an Affirmative Action Coordinator.  RJN, Ex. F at 2.  Moreover, the County Affirmative Action Officer is obligated

> (1) to develop, implement and monitor Contra Costa County's equal employment opportunity program; (2) to mediate and investigate discrimination complaints; (3) to identify artificial barriers to employment; (4) to interact with community groups, organizations, and the Contra Costa County Advisory Council on Equal Employment Opportunity; (5) to assist the Department Affirmative Action Coordinators; (6) to ensure compliance with federal and state EEO laws; (7) to counsel and assist department personnel on equal employment matters; and (8) to develop and implement programs to promote diversity in the County work force.

*Id.*

Finally, the County established a Hiring Outreach Oversight Committee.  RJN Ex. F at 1. That standing committee of the Board of Supervisors is charged with reviewing the statistical data of female and minority hiring by the County, and with making recommendations regarding outreach and recruiting.  *Id.*  Plaintiffs contend that the Hiring Outreach Oversight Committee is not qualified to oversee the County's hiring and recruitment processes, but Plaintiffs lack any credible basis to challenge the Committee's qualifications.

United States District Court
Northern District of California

26

United States District Court
Northern District of California

1    The County's evidence also shows that the County has and will take steps so that the

2    qualifications for each position are job related.  When there is an imbalance in a job classification,

3    the County conducts a minimum qualifications review.  Preston Decl. ¶ 4.  While that review is

4    currently required by the Consent Decree, the County states that it will continue this practice,

5    which the County considers to be "an industry wide best practice [that] is critical to the County's

6    recruitment process."  *Id*.  Indeed, the County's Personnel Management Regulations require

7    selection procedures to be "practical and job related, constructed to sample the knowledge, skills,

8    and abilities and/or personal attributes required for successful job performance."  RJN, Ex. D, §

9    504.  Title VII also prohibits the County from using facially neutral job requirements and tests

10   which are not job related and consistent with business necessity, if such requirements and tests

11   discriminate on the basis of race, color, religion, sex, or national origin on a disparate impact

12   theory.  *See Ricci*, 557 U.S. at 578 (citing 42 U.S.C. § 2000e–2(k)(1)(A)(i)).

13   The County has also presented evidence to show that it will continue equal opportunity

14   employment practices even if the Consent Decree is vacated.  When an imbalance exists, the

15   County's human resources department conducts a targeted outreach and recruitment to those

16   organizations, agencies and employers connected to the specific community where there is an

17   imbalance.  Preston Decl. ¶ 7.  The Hiring Outreach Oversight Committee is also charged with the

18   responsibility to continue to review the statistical data reflecting the numbers of women and

19   minorities employed by the County.  Defendants' broad approach to recruiting women and

20   minorities for all jobs is designed to accomplish the purpose of the Consent Decree: to attain

21   greater diversity in all jobs, at all levels of employment.

22   Finally, it is worth noting that the remedies available under Title VII have expanded since

23   1975.  Prior to the Civil Rights Act of 1991, the primary monetary remedy available under Title

24   VII was backpay.  *See Landgraf v. USI Film Products*, 511 U.S. 244, 255 (1994).  Section 102 of

25   the 1991 Act, however, allowed a plaintiff who proves intentional discrimination in violation of

26   Title VII to also seek compensatory damages for "future pecuniary losses, emotional pain,

27   suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary

28   losses," as well as punitive damages upon showing of malice.  42 U.S.C. § 1981a(b).  These

1    changes increased the deterrent effect of Title VII's prohibitions, which decreases the need for the
2    Consent Decree.

3        Under all of these circumstances, the Court finds that the County has substantially
4    complied with the Consent Decree, and that the ongoing day to day supervision of County
5    activities under the Consent Decree is no longer necessary.  The task of preventing and remedying
6    discrimination is not yet finished.  It may never be.  Today, however, 38 years after the Court
7    imposed the Consent Decree, the County has taken substantial steps on the path to equal
8    employment opportunity.

9        **3.    Whether Prospective Application of the Consent Decree would be Inequitable**

10       The County also moves to vacate the Consent Decree on the basis that "applying it
11   prospectively is no longer equitable."  Fed.R.Civ.P. 60(b)(5).  Rule 60(b)(5) "provides a means on
12   which a party can ask a court to modify or vacate a judgment or order if 'a significant change
13   either in factual conditions or in law' renders continued enforcement 'detrimental to the public
14   interest.' "  *Horne v. Flores*, 557 U.S. 433, 447 (2009) (quoting *Rufo v. Inmates of Suffolk County*
15   *Jail*, 502 U.S. 367 (1992)).  "The party seeking relief bears the burden of establishing that changed
16   circumstances warrant relief, ... but once a party carries this burden, a court abuses its discretion
17   'when it refuses to modify an injunction or consent decree in light of such changes.' "  *Horne*, 557
18   U.S. at 447 (2009) (quoting *Agostini v. Felton,* 521 U.S. 203, 215 (1997)).

19       The Supreme Court has noted three reasons why Rule 60(b)(5) "serves a particularly
20   important function in what [the Supreme Court has] termed 'institutional reform litigation.' "
21   *Horne*, 557 U.S. at 448.  First, consent decrees in institutional reform cases "often remain in force
22   for many years, and the passage of time frequently brings about changed circumstances−changes
23   in the nature of the underlying problem, changes in governing law or its interpretation by the
24   courts, and new policy insights—that warrant reexamination of the original judgment."  *Horne*,
25   557 U.S. at 448.  When consent decrees "remain in place for extended periods of time, the
26   likelihood of significant changes occurring during the life of the decree is increased."  *Rufo*, 502
27   U.S. at 380.

28       Second, the Court has recognized that cases involving institutional reform "often raise

United States District Court
Northern District of California

28

sensitive federalism concerns," as they "commonly involve[] areas of core state responsibility…."
*Horne*, 557 U.S. at 448.  "[C]ourts must remain attentive to the fact that 'federal-court decrees

exceed appropriate limits if they are aimed at eliminating a condition that does not violate [federal

law] or does not flow from such a violation." *Horne*, 557 U.S. at 450 (quoting *Milliken* v.

*Bradley*, 433 U.S. 267, 282 (1977)).  "Federalism concerns are heightened when … a federal court

decree has the effect of dictating state or local budget priorities." *Id*. at 448; *see also Rufo*, 502

U.S. at 393 n. 14 ("principles of federalism and simple common sense require the court to give

significant weight to the views of the local government officials who must implement any

modification."); *Frew*, 540 U.S. at 906 ("principles of federalism require that state and officials

with frontline responsibility for administering the program be given latitude and substantial

discretion.").

        Finally, the Court has noted that "the dynamics of institutional reform litigation differ from

those of other cases," as "public officials sometimes consent to, or refrain from vigorously

opposing, decrees that go well beyond what is required by federal law." *Horne*, 557 U.S. at 448.

The problem is that such agreements "bind state and local officials to the policy preferences of

their predecessors," *id*. at 499, and "[i]f not limited to reasonable and necessary implementations

of federal law, remedies outlined in consent decrees … may improperly deprive future officials of

their designated legislative and executive powers." *Frew*, 540 U.S. at 441.  "Where state and local

officials inherit overbroad or outdated consent decrees that limit their ability to respond to the

priorities and concerns of their constituents, they are constrained in their ability to fulfill their

duties as democratically-elected officials." *Horne*, 557 U.S. at 449 (quotations omitted).

        Based on these concerns, courts are instructed to take a "flexible approach" when

determining whether a federal court judgment should be vacated on the basis of equity under Rule

60(b)(5). *Horne*, 557 U.S. at 450.  A flexible approach is "often essential to achieving the goals of

reform litigation." *Rufo*, 502 U.S. at 381.  In applying this flexible approach, courts should

"ensure that 'responsibility for discharging the State's obligations is returned promptly to the State

and its officials' when the circumstances warrant." *Horne*, 557 U.S. at 450 (quoting *Frew*, 540

U.S. at 442).  Nevertheless, a flexible approach does not mean that vacating a consent decree is

warranted "when it is no longer convenient to live with the terms of a consent decree." *Rufo*, 502 U.S. at 381.

In *Horne*, the Supreme Court, in a five to four decision written by Justice Alito, reversed the Ninth Circuit's affirmance of the district court's decision denying a motion brought by the State of Arizona to vacate a series of orders and injunctions under Rule 60(b)(5).  The district court had required Arizona to increase its incremental funding for English Language-Learner ("ELL") instruction in order to come into compliance with the Equal Education Opportunity Act ("EEOA"), § 20 U.S.C. § 1703(f).  *Horne*, 557 U.S. at 438.  The Supreme Court reversed, writing that it was error to "focus[] excessively on the narrow question of the adequacy of the State's incremental funding for ELL instruction instead of fairly considering the broader question whether, as a result of important changes during intervening years, the State was fulfilling its obligation under the EEOA through other means." *Id*. at 439.

The Supreme Court wrote that to determine whether prospective application of a court injunction is equitable, courts must "ascertain whether ongoing enforcement of the original order [is] supported by an ongoing violation of federal law (here, the EEOA)." *Id*. at 454.  The EEOA requires states to take "appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs." 20 U.S.C. § 1703.  The Court held that, by focusing on Arizona's compliance with the district court's orders instead of Arizona's compliance with the EEOA, the lower courts improperly applied the "flexible standard that seeks to return control to state and local officials as soon as a violation of federal law has been remedied," and instead, "used a heightened standard that paid insufficient attention to federalism concerns." *Id*. at 450-51.

The Supreme Court remanded the case upon finding four factual and legal changes that were "critical to a proper Rule 60(b)(5) analysis," as they may have brought the school district into compliance with the EEOA.  *Id*. at 470.  First, Arizona transitioned from "bilingual" instruction to a "structural immersion" approach where all content is taught in English. *Horne*, 557 U.S. at 459.  Second, Congress enacted the No Child Left Behind Act of 2001, § 901, 20 U.S.C. § 7902, which altered federal education policy by granting state and local officials more flexibility in exchange

United States District Court
Northern District of California

30

for accountability.  *Id.* at 461.  Third, the school district underwent its own reforms by reducing class sizes, starting a uniform system of textbooks and curriculum, and eliminating the shortage in instructional material.  *Id.* at 466.  Fourth, there was an increase in overall funding that financed education in Arizona.  *Id.* at 469.  The lower courts were ordered to consider whether these changes brought Arizona into compliance with the EEOA's requirement that "appropriate action" be taken "to overcome language barriers … in instructional programs."  20 U.S.C. § 1703.

Under *Horne*, when considering a motion filed under Rule 60(b)(5), courts must consider whether there is an "ongoing violation of federal law."  *Horne*, 557 U.S. at 454.  "If a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper."  *Id.*

At issue in *Horne*, however, were a series of federal orders and injunctions.  There was no consent decree that was, at the time of entry, mutually agreed upon by the parties.  Consent decrees frequently bind the defendant to "undertake more than federal law requires, or more than a court could order absent settlement, to 'save themselves the time, expense, and inevitable risk of litigation.' " *Basel v. Bielaczyz*, 74 Fed.R.Serv.3d 523, at *6 (E.D. Mi. 2009) (quoting *Rufo*, 502 U.S. at 389).  That was certainly the case here.

A handful of courts have assumed that the Supreme Court's rule in *Horne* applies to consent decrees as well as to injunctions.  The Sixth Circuit, for instance, recently decided whether to vacate a consent decree fifteen years after Tennessee's version of Medicaid, "TennCare," was found to not be in compliance with certain Medicaid regulations.  *See John B. v. Emkes*, 710 F.3d 394 (6th Cir. 2013).  In addition to finding that TennCare had substantially complied with the Consent Decree, the Court held that "TennCare has implemented durable remedies to comply with the provisions of federal law that the decree was intended to enforce," and therefore, "continued enforcement of the [decree] is not only unnecessary, but improper."  *Id.* at 413 (quoting *Horne*, 710 F.3d at 413); *see also Calderon v. Wambua*, No. 74-4868, 2012 WL 1075840, at *6 (S.D.N.Y. March 28, 2012) (vacating a consent decree because factual changes made prospective enforcement inequitable, concluding that "continued judicial oversight is improper" because "there is no ongoing violation of federal law."); *Coleman v. Brown*, 922 F.Supp.2d 1004, 1029

1   (E.D. Cal., N.D Cal. April 11, 2013) (assuming there must be an ongoing violation of the law to

2   justify the consent decree, but distinguishing *Horne* because the consent decree did not require

3   more than federal law).

4   　　　The two district courts which have explicitly considered whether *Horne*'s rule applies to

5   consent decrees as well as injunctions have reached different conclusions.  In *Juan F. v. Rell*, a

6   district court in Connecticut denied a motion to vacate a consent decree upon finding that the

7   defendant had failed to satisfy the obligations of the decree's "exit plan," which required

8   compliance with the decree for six months.  No. 89-0859, 2010 WL 5590094, at *2 (D. Conn.

9   Sept. 22, 2010).  While acknowledging the federalism concerns and recognizing that federal

10   oversight of state services must be temporary, *see id*. at *4, the court refused to vacate based on

11   the decree's impact on budget priorities because any money spent by the State was required to

12   come into compliance with constitutional and federal law.  *Id*. at *3.  Finally, the court rejected the

13   argument that *Horne* significantly altered the Rule 60(b)(5) standard because *Horne* "involved a

14   declaratory judgment" and "did not call into question a district court's authority to enforce a

15   validly entered Consent Decree negotiated by the parties."  *Id*.

16   　　　In *Consumer Advisory Board v. Harvey*, however, a district court from the District of

17   Maine vacated a consent decree upon finding substantial compliance with the decree and no

18   ongoing violation of federal law.  697 F.Supp.2d 131 (D.Me. 2010) ("*Horne* explicitly advises

19   federal courts that perpetual oversight of state government programs is improper absent a record of

20   ongoing violations of federal law.").  The *Harvey* plaintiffs unsuccessfully attempted to

21   distinguish their case on grounds that *Horne* involved an injunction, not a consent decree.  *Id*.  The

22   *Harvey* court noted that *Horne*'s requirement was based on federalism concerns, and "federalism

23   concerns remain at the forefront regardless of whether the consent decree from which state

24   officials seek prospective relief was entered as the result of a trial or a settlement."  *Id*. at 138.

25   　　　This Court agrees with this point in *Harvey*—the Court must consider, in the context of a

26   consent decree, whether there is an ongoing violation of federal law.  Federalism concerns are

27   present whether a federal court oversees a state or local government's compliance with an

28   injunction or a consent decree.  The Supreme Court's requirement that a trial court consider

*United States District Court*
*Northern District of California*

32

United States District Court
Northern District of California

1    whether there is an ongoing violation of federal law is based on these federalism concerns.

2    Indeed, some federalism concerns are specific to consent decrees—the Supreme Court noted that

3    consent decrees "exceed appropriate limits if they are aimed at eliminating a condition that does

4    not violate [federal law] or does not flow from such a violation." *Horne*, 557 U.S. at 450 (quoting

5    *Milliken*, 433 U.S. at 282).  In addition, "public officials sometimes consent to, or refrain from

6    vigorously opposing, decrees that go well beyond what is required by federal law," and thus

7    constrain successors in office "in their ability to fulfill their duties as democratically-elected

8    officials." *Horne*, 557 U.S. at 448-49 (quotations omitted).

9         On the other hand, consent decrees have contract elements, and the Supreme Court has also

10   recognized the right of parties to freely contract to set the standard higher that federal law. *Rufo*,

11   502 U.S. at 389.  Public institutions may be incentivized to avoid litigation by agreeing to a

12   consent decree that imposes more requirements than the law. *Id*.  Nevertheless, noting that a court

13   must consider whether there is an "ongoing violation of federal law" is not inconsistent with a

14   consent decree that requires more than federal law in order to bring an institution into compliance

15   with federal law.  Although a decree may provide remedies beyond those that would be required

16   by federal law, in suits against municipalities and states, the Court must consider whether there

17   continues to be an underlying violation−even if there remedy of the decree is greater than the law

18   would require.  Moreover, in *Horne*, the Supreme Court did not hold that a judgment or decree

19   should be vacated the exact moment there is compliance with federal law.  The Court held that

20   when a "durable remedy" is achieved, "continued enforcement of the [consent decree] is not only

21   unnecessary, but improper." *John B.*, 710 F.3d at 412 (quoting *Horne*, 557 U.S. at 450).

22        In this case, there are substantial federalism concerns.  The Consent Decree has been in

23   place for almost 38 years, and "the longer the injunction or consent decree stays in place, the

24   greater the risk that it will improperly interfere with [the] democratic process." *Horne*, 557 U.S. at

25   453.  Indeed, the Consent Decree anticipates that concern: Article IX allows for termination after

26   five years from the date of entry.  Nonetheless, the Consent Decree contains no "exit plan" or

27   "sunset clause" that would provide a roadmap out of perpetuity. *Cf. Juan F.*, 2010 WL 5590094,

28   at *2; *John B.*, 710 F.3d at 407.  Meanwhile, the County is obliged to pay Plaintiffs' attorney tens

United States District Court
Northern District of California

1   of thousands of dollars each year to monitor its compliance with the Consent Decree. *See Horne*,

2   557 U.S. at 448 ("Federalism concerns are heightened when … a federal court decree has the

3   effect of dictating state or local budget priorities.").

4         In the First Amended Complaint, Plaintiffs alleged that the County engaged in a "pattern of

5   discrimination" against women and minorities in violation of Title VII.  FAC at 1.  There has been

6   no showing that such a broad "ongoing violation of federal law" continues today. *Horne*, 557

7   U.S. at 454.  The only significant evidence submitted to the Court on this subject by Plaintiffs−the

8   alleged failure of the County to provide 80% numerical balance in all county job categories−does

9   not prove a violation of Title VII.  "Title VII is express in disclaiming any interpretation of its

10   requirements as calling for outright racial balancing." *Ricci*, 557 U.S. at 582 (citing § 2000e–2(j)).

11   While the County's alleged systematic violations of Title VII may have justified the entry of the

12   Consent Decree in 1975, Defendants' compliance with the Consent Decree, as well as significant

13   changes that have occurred over the last 38 years, have provided a "durable remedy" sufficient to

14   justify its termination. *Id*. at 451.

15         The Court discussed such changes in detail in the previous section.  The County has gone

16   beyond the requirements of the Consent Decree to promulgate and implement a detailed regulatory

17   framework to prevent and remedy discrimination−and to provide equal employment opportunity to

18   all of the County's citizens.  The County also established the Hiring Outreach Oversight

19   Committee, which will maintain several procedures of the Consent Decree designed to protect

20   women and minorities from discriminatory hiring practices.  Moreover, since 1975, there have

21   been significant changes in remedies available under Title VII, as the Civil Rights Act of 1991

22   made compensatory and punitive damages available to plaintiffs who prove intentional

23   discrimination. *See* 42 U.S.C. § 1981a.

24         As a result of these changes and the County's compliance with the Decree, the County's

25   workforce is more diverse today than it was in 1975.  While the County's diversity statistics may

26   not be sufficient to show that it employs minorities and women at or above the 80% rate in all

27   categories under the Consent Decree, they are certainly relevant to show that women and

28   minorities are employed at substantially higher rates than they were in 1975.  The task is not yet

done−nonetheless, there is a durable remedy in place.

**IV.     CONCLUSION**

For the foregoing reasons, the Motion to Vacate the Consent Decree is GRANTED.

**IT IS SO ORDERED**.

Dated: January 22, 2014

_____
JOSEPH C. SPERO
United States Magistrate Judge